on behalf of Mr. Rios-Barraza. Your Honors, I think it's pretty clear, based on the prior holdings of this Court, that the grand jury instruction on punishment in this case, which differed from the model charge, was error. And the more interesting question is, what should this Court do about it? In other words, is this structural error or does harmless error analysis apply? And the answer, Your Honors, is that it's structural, and here's why. Your Honors, the grand jury has a dual function. The grand jury has a dual function. The first part of that function is to determine whether there's probable cause to indict. But there's a second and equally important function, and that is to determine, even where there's probable cause, whether a case is worthy of indictment. Your Honors, the cases applying harmless error analysis in the grand jury context uniformly deal with the first role of the jury. And here I'm talking about Bank of Nova Scotia, mechanic, and this Court's decision in Navarro. The concern in these cases was that the error in some way may have interfered with the grand jury's ability to assess probable cause. So, for example, in Bank of Nova Scotia, there was prosecutorial misconduct that infected the presentation of evidence to the jury. In mechanic, there were two witnesses who simultaneously were before the grand jury during the presentation of evidence. In Navarro, the grand jurors were told that in making their probable cause determination, they should assume and understand that the assistant United States attorney would be presenting exculpatory evidence when that was false. These all deal with the first function of the grand jury. And the Supreme Court in Bank of Nova Scotia and mechanic and this Court in Navarro has said, well, that's something that we can assess. That's quantifiable. Because, for example, in mechanic and Navarro, we can look to the pettit jury's verdict and say, well, okay, if there had been, if we hadn't had these problems in the presentation to the grand jury, they still clearly would have found probable cause because we have a beyond reasonable doubt verdict by the pettit jury. And in Bank of Nova Scotia, where we never had an ultimate verdict, the Court does what courts traditionally do, assess the evidence that was presented, how the prosecutorial misconduct affected that presentation of evidence, and whether there would have been a probable cause determination without the error. This case is different, Your Honors. Here we are arguing that the error affected the jury's ability to fulfill its second role, its ability to say, yes, there's probable cause. But we are still going to exercise our discretion not to indict in this case. And that's why this case is like Vasquez v. Hillary, where the Supreme Court found that it was structural error. Yes, Vasquez is a race discrimination case, but that's not all it is. The real issue in determining whether it was structural or harmless error in that case was the Court saying we cannot evaluate how the grand jurors, if the grand jury was properly constituted, would have assessed the need to indict. That's the second function. It was clear. Let me ask you, assuming it's error, what evidence or what facts would the jury have in front of it to weigh in considering the punishment here? How would it get to the jury that there would possibly be a punishment that would result in deportation in this case? Well, of course, it wouldn't have happened in this case because they were told they could not ask that question. I know, but I'm saying assume they weren't told that. Well, assume they weren't, and this would go more to if it were harmless error. But assume they weren't, it's an illegal alien in possession of a firearm case. The natural question is, is this person going to be deported, which, of course, is part and parcel of punishment. You mean a question that a juror could ask? Absolutely, Your Honor. It's certainly reasonable that a juror could say, is this person going to be deported? What happens if the juror asks the question? What's the obligation to give them the answer, and who gives it? I don't – I wouldn't say that there's an obligation for the assistant United States attorney, who is, of course, the only party there, to give that answer. It would be wise, in my view, to give that answer, but there's no obligation. The grand jury would then have the ability and opportunity to go to the judge if they didn't like the answers that they were getting or weren't getting answers. And, of course, the grand jury, and this is under the Supreme Court's cases of Costello and Calandra, they determine the scope and the course of their inquiry, unfettered by rules. And if this is information that they want, then this is information that they may ask for. So it would be up to the jurors themselves to ask and bring out this information? That's exactly right, Your Honor. Is that usual that the jurors do ask such questions? I mean, it seemed to me, and this was figured also by Judge Wardlaw's question, how would they ever get this information that he'd been here since he was one year old, that he could get legalized and otherwise he's going to get deported? Yes, Your Honor. Of course, I've never been at a grand jury. The defense is not privy to that. My understanding from, quite frankly, having listened to the oral arguments from some prior cases on similar issues and the representations made by the Assistant U.S. Attorneys in those cases, is that it's very frequent, in fact common, and I suppose my colleague can speak to this, for the grand jurors to ask for things we would not normally consider appropriate or typical considerations. For example, what is this person's criminal history? And I think each Assistant United States Attorney decides how to answer that question as they see fit, and there's no rule. But certainly the grand jury has the right to ask the question. That seems clear, whether it's wise that they consider this. I think our framers have made the determination, and the Supreme Court has said in Vasquez, well, that it is wise. This punishment is something that the grand jury may consider. Then specifically in this case, how might they ask this information or find out? Well, isn't that true? If they can consider it, wouldn't it be true in every case that the only way they'd get the information is by asking the question? Asking the question or subpoenaing witnesses or requesting evidence, all things that the grand jury has a right to do. The court supervises, and the grand jury needs the court to help them issue subpoenas and bring witnesses to court, but this is wholly within the function of the grand jury to do that. Aside from what I call the mitigating factors in this case that the grand jury I think properly might have asked about when they saw it was an illegal alien case, on the flip side, it's certainly possible that the grand jury or some of them would have said, well, hold on. This guy's here illegally. Isn't he going to be deported? Well, how much time does he get in this case? How much time are we going to waste Federal resources incarcerating this person before he's deported? Maybe we're going to exercise our discretion to say, oh, we don't think this is an illegal alien case. We're going to use Federal resources and prosecution. We're not going to come back with an indictment. We don't know, but I think that's the point, is that it's purely speculative. Just like in Vasquez, it was wholly speculative how the need to indict might be assessed. Was this instruction given to this grand jury? I mean, it's given once, right? And then the cases are presented? My understanding, although, again, I'm not present, is that this instruction was given once at the beginning to the panel. Right. And I don't know if they have a written copy of it with them or how that works. And the reason I'm asking is I'm wondering how are there other cases in the pipeline on this particular instruction and how many other cases are possibly affected by this instruction being given to that particular grand jury? Absolutely, because, of course, this is not the model charge, so this wouldn't wipe out all convictions under the model charge. I'm not aware of any other cases. I presume there may be some, but what I can say is this is an October 2008 grand jury. Certainly many, if not most, of those convictions would be final. We know that a guilty plea eliminates a defendant's ability to bring one of these charges, so it would have to have been preserved in some way. The conviction eliminates it, you know, after a jury. The conviction does, but also a guilty plea under Tollett v. Henderson, a Supreme Court case. A defendant's guilty plea weighs grand jury challenges. A conditional guilty plea. Absolutely. I guess my less specific point is someone would have had to preserve this, the case would not be final. There are all sorts of reasons that this probably doesn't apply to very many cases. But, of course, the Supreme Court has also told us in their Apprendi line of That's really not the consideration. If there was a constitutional violation here and it was structural. There's other panels that are facing this issue right now. Not that I'm aware of. There may be, but not that I'm aware of. I would just also point out that the Supreme Court's recent, fairly recent 2006 decision in Gonzalez-Lopez really speaks to whether this is a structural or a non-structural error. In that case, the court focused on saying that one of many ways an error can be structural is that it defies analysis. That we just cannot quantifiably, in the way that with probable cause we can quantifiably evaluate, we can't quantifiably determine how this error may have affected things. Your Honor. Oh, I thought you were going to hook up. Go ahead. I was going to turn to another issue, but if there are additional questions on I did just want to speak to the Corley issue briefly. This is the October 20th statement that we argue should be suppressed because of the presentment delay. Government counsel just informed me, and I'll let her speak for herself, but she did inform me before argument that the government is no longer contesting that Corley and 3501 apply to this case, but that the dispute is still remains over whether the delay was reasonable. And I did want to just note from the number of cases that specifically speak to whether this type of delay would be reasonable. Corley, saying delay for the purpose of interrogation is the epitome of unnecessary delay. Liera, where this Court said it doesn't matter if you need more information to decide whether to file charges, delay to interrogate is unreasonable. You've already determined that there's probable cause to arrest the person. Now bring him before a magistrate. Hallstrom, where this Court said an example of unreasonable delay is gathering evidence to justify an arrest. Alvarez-Sanchez, this Court's opinion, which said that interrogation is not a valid reason, and Wilson, where this Court said the desire of the officers to complete interrogation is perhaps the most unreasonable excuse possible under 3501C. For all of those reasons, the delay was unreasonable. And I'd like to reserve the balance of my time, Your Honors. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Mika B. Seville for the United States. I'll address the issues in the order that Ms. Yates addressed them this morning. First, with respect to the grand jury instructions at issue here, I'd like to back up and first contest that there was error with the instruction that was given  here. I think that the district court did not commit an error, and certainly not a structural error, when it instructed the grand jury that when considering whether or not to indict, you cannot consider punishment in the event of conviction. This Court's analysis of grand jury instructions has always turned on whether the instruction unfairly constrains or invades the grand jury's independence. I think here a review of the charge given by the district court to the panel of jurors repeatedly and explicitly protected the grand jury's independence. I believe if you review the record, the independence of the grand jury was mentioned at least five times. But when they say you can't consider this, you expect the jury to abide by that admonishment. I can't imagine that they would do otherwise. And you rely on something where you told them they're independent? You mean, does that mean to them that they shouldn't pay any attention to what they're told by the judge? No, Your Honor. I think that jurors tend to take their instructions seriously, as they should. But I think that here when they're repeated, when they're advised over and over of their independence. What do you mean independence? You mean freedom to disregard what the court tells them? Freedom to decide whether or not to indict when they're considering the evidence presented to them. Is that what independence is? I mean, somebody tells you don't consider this, and then they say you're independent. I mean, this is – I mean, we could put this in an opinion. The judges are – the grand juries are free. The government's position is they're free to do whatever they want and to disregard what the judge tells them because they're independent. Is that the case? Your Honor, I think the comparison that I would make here is to the case Carruto that the parties submitted 28J letters with respect to. And in that case, the instruction that was challenged was that jurors should not consider  And I would submit to the court that there's – You said the word whatsoever didn't add anything to saying they shouldn't. Yes. Which we've said shouldn't doesn't mean may not. Yes. And I'm – And whatsoever didn't change that. I understand that, Your Honor. And I agree that that was the court's holding. I suppose what I'm suggesting is that I don't know that there's a meaningful distinction to a juror. I would submit that a juror who – I agree with you. Should not – We probably went off the rails when we said that there was a difference. But we've been saying that for years. And I don't think we're free to change that. I mean, the rule, Judge Wardlaw and I were on one of those cases. And we said it makes a difference. And that's why it's okay. Because we didn't say you may not. We said you should not. Now, that may not, as you say, have been a very reasonable decision. Although we were bound when we made it. But that certainly is the law that may not is different from should not. Yes, Your Honor. I agree. That is the law. I guess I would say – So I've made that comparison there with the Carruto instruction. I think that that distinction is not particularly meaningful. And I think when advised with these admonishments about independence, jurors would understand their ability to – Okay. Because if we're going to write an opinion, I want to know the government's position. This may be very interesting. Yes. It is that even though the judge tells you you are not permitted to do this because he tells you that you're independent, you are permitted to do it. Well, I suppose what I'm saying is not that you can disregard the judge's instructions, but that a juror taking the instruction as a whole, these repeated the words, you cannot consider punishment, and would think to themselves, you know, it sounds like I'm really generally not supposed to consider punishment, but I am able to take into consideration all these other factors about whether I decide whether or not to indict and go from there. Jurors consider all sorts of things that we're not aware of when they make their decisions and their deliberations. I guess one other thing I'd like to point out about this is that the court has been clear that grand jury charges should be analyzed as a whole and not with such a focus on just one single word such as cannot or should not or must, will, that type of distinction. But I will move on. Also, one other thing. In Navarro-Vargas, this court has upheld an instruction using the word cannot. And so the government finds that instructive with respect to its position. In Navarro-Vargas, the court upheld an instruction that jurors cannot consider the wisdom of the laws in their deliberations. And so, again, I think that by upholding an instruction with that word cannot, the grand jurors maintained their independence. However, even, I'll move on to the harmless error, structural error distinction because it seems like that may be at the heart of the court's decision. Not necessarily. They could win either way, whether it's harmless or, the harmless test or the structural test. Understood, Your Honor. No, no, but I don't mean to discourage your analysis. I just wanted you not to think that the court's primarily interested in that. I think we'd be interested in, A, is it structural? And if it's harmless, is this really harmless? Yes, Your Honor. So with respect to the appropriate standard, the harmless error versus structural error, I think that the court in the Caruto decision, this recent decision Well, could you first talk about what counsel raised in the Supreme Court case. It said if you can't tell, it would be Yes. I believe she referenced Gonzales-Lopez where she said that the court says structural error is appropriate if the issue defies analysis. I don't think that we fall in that here, Your Honor. I think that here Okay. Why in this case can you analyze it and know what the jury would do? Your Honor, well, I don't think we have to know what the jury would know with 100 would do, excuse me, with 100% certitude, because the standard, well, under a harmless error analysis is whether there's grave doubt that they would have refused to indict had they known about the punishment here. I think we don't have to know with 100% certitude what In terms of the structural error, can you really determine what the grand jury would do by analysis if, one of my colleagues said, if they found out that this was someone who had been brought here by one, at the age of one by his mother, and that anybody else who carries a gun would receive, A, would be exercising a constitutional right, but B, would receive a light punishment, maybe violating a license law, and it's only because he was brought here by one that he would now be separated for life from his two children and his American wife? How do we know whether that might influence jurors? People are very sensitive these days to this whole problem of illegal aliens, and it could work either way. I agree, Your Honor. I think How do we know what a jury would do? Well, I think one of the ways that we know here is the questions that the Court raised with Ms. Yates point out that these sympathetic facts that the defense has raised and mentioned as being facts that the jurors might consider when making their decision about whether to indict are very unlikely to end up before the grand jury. Why? Because the government has a responsibility to determine in the status of illegal aliens what happens to them, what the consequences are. Why is it unlikely that one juror might not ask those questions? Well, I think, Your Honor, because the government does not have an obligation to present this sort of exculpatory or sympathetic evidence to the grand jury, it's – while they may ask – well, I think, first of all, it's fairly unlikely that they're going to ask about this. But even assuming that they do – Well, if they ask, does the government have to answer? Does the judge – does someone have to answer their question if they raise it? In my experience, Your Honor, I don't – in my experience, when jurors ask questions such – questions that do not pertain specifically to a finding of probable cause in the facts presented to them, it's common practice that they're told that it doesn't pertain to the proceedings before. This is probably the illegal alien versus documented person carrying a weapon or a citizen carrying a weapon probably goes to the wisdom of the laws more than punishment. I think that that would depend on each juror's perspective, why they would decide to indict versus not to indict, whether it's their perspective that, for example, yes, the immigration laws are inappropriate and people shouldn't be deported versus some objection to the punishment. Or that that's too great a punishment for carrying a gun that everybody else is carrying. Right. Also, I think it's worth – But if you were to ask what you would say and if you said to a jury that's not something that you should consider, that would be an error, wouldn't it? That's the way the instruction is. I think if it were to say – if you said that – I suppose according to the defense theory, if you said you cannot consider it, but if you said that's not something you should consider, it still would be something that – That's right. Based on that distinction. Yes. But if you said you can't consider it, that would be an error. And if you said, well, you shouldn't, and they said, well, we'd like to, you don't have to do it, but how do you think you'd make friends out of the grand jury? Probably not, Your Honor. Probably not. And being a very wise U.S. attorney, you'd do what was best and you would tell them the facts. I probably would, Your Honor. There are certain times they ask questions that the government – for example, criminal history. We tend not to answer that question because we hope that it won't – if a defendant does have criminal history, we don't want it to prejudice the jurors. A question like this, the government might provide the answer. And in this case, the punishment that the defendant faced was a statutory maximum of 10 years, but in fact a guideline sentence of in the neighborhood of one year, so it was quite light. That combined with some facts that I think are not sympathetic at all, the fact that the defendant was trafficking in drugs and was a gang member, I also think those are the sorts of facts that are going to – But did anybody ask about that? Well, because the case – They'd say to you, what is the punishment? And, you know, if you didn't consider that deportation was part of the punishment, somebody might be smart enough to say, but what does this do? You know, what's the effect? And if you said deportation, that would be? And, Your Honor, I have to be honest. In a case like this, I would likely say to the jurors that I don't know exactly the ramifications. It seems to me that the immigration laws are complex on these types of things that I wouldn't want to represent. The Supreme Court said a defense lawyer is guilty of ineffective assistance of counsel if he can't answer those questions. That's correct, Your Honor. They are advised very carefully before they answer guiltily about the consequences of – the immigration consequences. I guess the one last point I would make about the structural – that this case rises anywhere close to the cases the Supreme Court has found structural error in. For example, Vasquez v. Hillary, that was based on – the court found structural error based on the racial discrimination in the selection of the grand jurors and called it a grave constitutional trespass. And the name escapes me of the other case right now, but similarly, the second one where I believe they found structural error was where there was I just don't think that here we rise to that – even close to that level in terms of a grave constitutional trespass when we're talking about one small word in the context of a large instruction given to the grand jurors. What's your harmless error argument? The harmless error argument is that there's no grave doubt here that the jurors would have refused to indict had they known about the punishment. Because there are these significant negative facts about the defendant that probably would have warded off any sympathy towards the defendant. The sympathetic facts that the defense mentions are very unlikely to come in or to persuade the jurors not to indict in this case. That's an interesting case. Yes, Your Honor, it is. It looks like I'm very short on time here. I just want to make sure to advise the Court concerning the issue of the October 20th statements that Ms. Yates mentioned. I apologize for not notifying the Court of the government's changing position sooner. Unfortunately, we did just reach this decision Friday afternoon. But after reviewing the Sotos-Lopez case cited by the defense in their reply brief and the facts of this case, the government concedes that the facts of this case do fall within Sotos-Lopez because the defendant here was held both on an immigration detainer and on Federal criminal charges. However, the government does maintain that any delay in presentment was reasonable here. How many days before he was presented and what was the reason for not presenting him? Your Honor, he was originally arrested by the La Habra Police Department on October 16th, and he made his initial appearance in Federal court on October 23rd. The 16th was a Thursday, and the 23rd was the following Thursday a week later. So what was the explanation for the week? I mean, I'm kind of inclined to avoid this whole structural error thing, because I have problems with the prompt presentment. Your Honor, I think, let's see. The reason for the delay, that was the question. Pardon me? Yeah. What was the reason for this week's delay? Well, I think as the district court – so there were a couple – he was arrested on the 16th by local officers who then called the Federal officer and told him they had this person who was in possession of a gun and an illegal alien. This was on a Thursday. And then the ICE agent picked him up the following Monday and interviewed him. In the meantime, he's conducting his own investigation into the defendant's immigration status, the status of the gun. But it doesn't seem as though the right to prompt presentment should depend on the activities of ICE. Well, I think here – I think what's notable here is that the district court, I think, would agree with you to some extent. It seems that by suppressing the October 23rd statements, the district court found the delay all the way to the 23rd and the interrogation on the 23rd to be unreasonable. Well, you also have the 20th and the 16th. Right. And I think that the – it appears that the court found that that initial delay was reasonable. And that was after hearing testimony about what happened, hearing from the different officers. And I think that that finding by the court should be upheld. And largely, there's a case, Garcia-Hernandez, that reasons that and explains that as long as the delay is not caused by a desire merely to interrogate, that it can be reasonable if it's to allow, in part, the agent to continue to investigate the case and to determine whether or not criminal charges will be filed. And I think that's what was happening here, is the defendant here was – or, excuse me, the agent here was trying to determine, trying to consult with the U.S. Attorney's Office, trying to conduct his own investigation. Wait a second. When did he figure out that he was here as an illegal alien? I believe he ran immigration check in databases on the 16th. Right. So he knew as of the 16th that he could file this charge, illegal alien in the U.S. Attorney's Office. Firearm. Well, according to the agent's testimony, he needs to conduct his own independent investigation, that he can't rely entirely on what the state and local officers tell him. So he was investigating, you know, whether the gun traveled in interstate commerce, for example, and putting together the case for the U.S. Attorney's Office. Your Honor, I think what may have happened here, and I'm speculating a little bit, but I'm not sure that the local officers who initially arrested the defendant made the federal agent aware that they had written down that they arrested him on a federal charge. And so I think it creates a difficult situation when the federal government's not aware that somebody's been arrested on a federal charge to know that the clock is ticking. But I think what's key here is that there was no – there's nothing in the record to suggest that the agent here or the agent in conjunction with the defendant had concocted some plan to let the defendant sweat it out in custody over the weekend in order to elicit some great confession the following Monday on the 20th. And in light of that, I think that in light of his good faith and in light of his reasonable efforts in investigating the case, that it should be considered reasonable. Could I just make one comment? You've got two difficult issues here. I don't know how either would come out, but they're two difficult issues. Do you think there's any chance while we're considering all these issues that the two of you could get together and maybe arrive at something that would not have the deportation consequences that you now realize this would have? For this particular defendant, Your Honor? Yeah. That's not something that I could decide on my own, but I certainly could consult with my office and the people who can make those sorts of decisions. Okay. Well, you can let us know if there's any chance. Yeah, if we were to reverse some – I mean, I'm troubled by the prompt resentment. I mean, the answer that they weren't – they're not talking to each other properly and they're still interrogating him is not a very satisfactory answer to me. And what I'm thinking is that if we reverse on that, the guilty plays out the window and you have room to plead – you know, to enter a plea to something less than what he pled to originally. Okay. I would not have to negotiate. It wouldn't necessarily settle the question of the indictment, because if you have to decide – No, but it would in this case, and he wouldn't be deported, which might be nice. Well, wouldn't it? It would just leave him back with you again to decide what to do if – I mean, you just go ahead. We get rid of the guilty play. You just send him to trial. But if you wanted to avoid a decision to dismissing the indictment, that you might do if you made some kind of a deal and the appeal were withdrawn. You might be happier in the long run if you found out a way that he didn't have to – but that's up to the two of you. Thank you, Your Honor. I understand. Thank you. We have enough to consider. No reason you shouldn't have one. Thank you. I thought we were done. Thank you, Your Honors. I know it's late in the day and was certainly discussed with opposing counsel the possibility of a disposition in this case. Just briefly, Your Honor is absolutely right on the grand juror being told that they have independence and that not fixing the problem. Grand jurors are basically told, you're independent, you don't have to indict, but by the way, you can't consider punishment in making that decision. So that's no fix to the problem. In terms of whether this was a harmless error or a structural error, I really think a good analogy is the public trial analogy, because that's the kind of situation where we say, how might this have actually affected the case? I mean, we could have an incredibly guilty person of a heinous crime, and if the right to public trial was violated, that's structural. And it's structural because we can't assess how that right might have affected the case, and it's also structural because we see inherent value in having public trials. And Gonzalez-Lopez is a right to counsel of one's choice case, and in that case they talk about this not being a procedural due process nicety, but this being something that we care about just in and of itself that has importance. And I think that that's the type of error that we're talking about here. It's like Vasquez error also, where the defendant in some ways, I believe it was a white defendant in that case, although I may be mistaken, but the defendant in some ways was raising rights that the grand jurors had. And that's what we have here as well. So for all of these reasons, it's like the structural error cases. If this Court does believe that harmless error applies, I would be strong. No. If this Court does believe that harmless error analysis applies, I would note that the burden is clearly on the government in that respect, and they put forth nothing in their briefs to meet that burden. They simply said, well, the defendant hasn't given us any reasons, but that's not the test. And so for that reason alone, I would say that we would prevail on harmless error. But to the merits of that, so to speak, the Court is completely right. This is a sensitive issue, illegal immigration. We're here in Southern California. It's certainly plausible that one or some of these jurors would have been interested in this. The deportation ramifications are flagged by this case. It's an illegal alien in possession of a firearm. It's not something that has to be sought out in any way. And, in fact, the sympathetic facts were probably flagged as well. We can't know what evidence was presented to the jury, but the confessions, the ICE confessions on the 20th and the 23rd, at the end of that, you know, kind of confession, the questioning list, at the end of it, it says, do you have anything you'd like to add? And both times, Mr. Rios says, I want to see my kids. When can I see my kids? This is evidence that was probably before the jury. And so it's certainly reasonable to think they might have asked about that. Just to the poorly issue, the Court's absolutely correct. The agent Monson had all of the information he needed on October 16th, or the agents in general. In fact, the obligation goes to the state police officers as well, if they're arresting on a federal charge, to present. At Excerpt of Record 32, Detective Backlett says that they knew the probation officer for Mr. Rios. He had the juvenile probation officer, and that he'd given him the immigration status before the search. And Detective Barnes, who did the interrogation in this case, he said he knew Mr. Rios was in the country illegally prior to the search. That's Excerpt of Record 52. Agent Monson was given the serial number of the firearm during that first phone call on the 16th, Excerpt of Record 83. And at 194, Agent Monson did do an ICE records check on October 16th. They had all the information they needed. That's why they arrested him. That's why they had probable cause to arrest him. And this delay was wholly unnecessary. Thank you, counsel. Thank you, Your Honor. The case is derogated and will be submitted. Thank you both very much. Thank you. Court is adjourned.
judges: Fletcher B. , Reinhardt, Wardlaw